UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

------------------------------------------------------------------------------------------------------

In re:                                              Case Number:  06-10155-11

ROBERT BAHRAM JAFARI and
POOPAK AMANDA JAFARI,

        Debtors.

------------------------------------------------------------------------------------------------------

MEMORANDUM OPINION, FINDINGS OF FACT,
AND
CONCLUSIONS OF LAW

        Eleven years ago, this Court had the occasion to consider the unfortunate

predicament of a debtor who found herself trapped between "a modern day version

of Scylla and Charybdis," Homer's mythical sea monsters, when she financed her

casino binges with her credit cards.  See Chevy Chase Bank, FSB v. Briese (In re

Briese), 196 B.R. 440 (Bankr. W.D. Wis. 1996).  Over the intervening years, the

debate about the social costs associated with the rising tide of gambling has raged

unabated, even as the gambler mythos has permeated ever more deeply into the

societal consciousness.  Today, poker tournaments are highly-rated "sporting"

events on television, Las Vegas ranks as both one of the most popular tourist

destinations in America and one of the nation's fastest-growing cities, and gaming

is a sprawling, ever-expanding industry that rakes in billions in profits each year.[1]

_____

        [1]  The American Gaming Association indicates that in 2005, gross gambling
revenue (the amount wagered minus the winnings returned to players) in the United States
was $84.65 billion. See Gaming Revenue: Current-Year Data, http://www.american
gaming.org/Industry/factsheets/statistics_detail.cfv?id=7 (last accessed September 20,
2007).  According to the Las Vegas Convention and Visitors Authority, Las Vegas hosted
(continued...)

The debtor in this case was quite familiar with Las Vegas, the glittering "Sin City" whose self-referential tourist slogan is that "what happens in Vegas stays in Vegas." Given the apparent frequency of his visits, a number of casinos in Las Vegas and elsewhere were also familiar with the debtor, quickly marking him as a high roller, undoubtedly of the best kind - one whose staggering losses totaled in the millions. Several of these casinos have filed proofs of claim for the amounts represented by the "markers" the debtor executed during his various gambling excursions. Both the debtor and the Chapter 11 trustee have objected to the allowance of these claims because gaming debts are unenforceable under Wisconsin law. Specifically, Wis. Stat. § 895.055 provides:

> Gaming contracts void. (1) All promises, agreements, notes, bills, bonds, or other contracts, mortgages, conveyances or other securities, where the whole or any part of the consideration of the promise, agreement, note, bill, bond, mortgage, conveyance or other security shall be for money or other valuable thing whatsoever won or lost, laid or staked, or betted at or upon any game of any kind or under any name whatsoever, or by any means, or upon any race,

---

[1](...continued)
some 38.9 million visitors in 2006, a figure which broke the prior record (set the previous year). Statistics from the U.S. Census Bureau indicate that Las Vegas was the third-fastest growing city in the U.S. during the period from 2000 to 2003, increasing in size by some 14.6%. Meanwhile, emerging research suggests that the social costs of gambling, such as increased crime, lost work time, bankruptcies, and the financial hardships faced by the families of gambling addicts adversely affects the American economy, perhaps by more than $50 billion annually. See Earl L. Grinols, Gambling in America: Costs and Benefits 177 (Cambridge University Press 2004). See also John Warren Kindt, The Failure to Regulate the Gambling Industry Effectively: Incentives for Perpetual Non-Compliance, 27 S. Ill. U. L. J. 219, 221 (2003) ("The United States has periodically experimented with legalized gambling activities. In each historical 'wave,' the social costs related to gambling became both apparent and overwhelming, consistently leading to the criminalization of all gambling activities."); July 1996 Wisconsin Policy Institute Report, The Social Costs of Gambling in Wisconsin, at 17 ("Reports on compulsive gamblers have suggested that one person's gambling may have profound effects on as many as 10 to 20 other persons.").

fight, sport or pastime, or any wager, or for the repayment of money or
other thing of value, lent or advanced at the time and for the purpose,
of any game, play, bet or wager, or of being laid, staked, betted or
wagered thereon shall be void.

The facts are as follows.  The debtor, Robert Jafari, was the CEO of a chain

of nursing homes, ostensibly a successful and wealthy entrepreneur.

Unfortunately, the debtor is also a gambling addict (or "pathological gambler," as

some sources define the problem).[2]  According to the debtor, he is currently

undergoing treatment for his condition, but it has already cost him his job and was

the precipitating factor in the filing of this bankruptcy case.  In the throes of his

obsession, he was unable to grasp the economic logic of high stakes casino

gambling:  namely, that the more often you wager, the more the "house" wins,

because the odds are always in their favor.  Apparently, like many pathological

gamblers, the debtor managed to beg and borrow (if not steal) to fund his habit:

Prior to 2005, he allegedly borrowed some $3 million from family friends, while his

father also helped pay off other gambling debts.  In 2005, the debtor continued this

destructive pattern, gambling extensively at the three casinos in question:  Wynn

Las Vegas, a Nevada casino; Desert Palace, Inc., d/b/a Caesar's Palace, another

---

[2] Pathological gambling is "a disorder characterized by a continuous or periodic loss
of control over gambling, a preoccupation with gambling and with obtaining money with
which to gamble, irrational thinking, and a continuation of the behavior despite adverse
consequences."  See Committee on the Social and Economic Impact of Pathological
Gambling and the National Research Council, Pathological Gambling: A Critical Review 18
(National Academy Press 1999).  To borrow from the quintessential ode to the gambler,
such people appear psychologically incapable of heeding the advice: "You've got to know
when to hold 'em, know when to fold 'em, know when to walk away and know when to
run."  Lyrics to "The Gambler," written by Don Schlitz and performed by Kenny Rogers
(1978).

Nevada casino; and Atlantis Casino, a casino located on Paradise Island in the
Bahamas and owned by Paradise Enterprises Limited.[3]

According to Wynn Las Vegas, the debtor met Steve Wynn in early 2005, at
which time Wynn approved the debtor's initial line of credit.[4]  Thereafter, the debtor
gambled over a period of five weekends between April 28 and June 25, somehow
managing to repay all credit advances made by Wynn during that time.  From
August 7 to September 2, the debtor made an additional seven trips to the Wynn
casino, and again repaid his markers.  On September 17, the debtor executed a
credit agreement with Wynn which provided for a $150,000 line of credit; this line
was ultimately increased to $1,000,000.  Intriguingly, it appears that Wynn was not
satisfied with waiting for the debtor to come back to Las Vegas on his own, as the
casino sent solicitations to him and paid for or "comped" at least a portion of his
travel during this time period, even going as far as arranging a chartered plane for
him.  The markers for credit advanced on September 2, and those issued during
the debtor's trips to Wynn Las Vegas on September 16-19 and September 26-27,
were ultimately presented to the debtor's bank account and returned with payment
denied.  These markers provide the basis for Wynn's proof of claim, filed in the
amount of $1,205,178.60.

---

[3] The debtor apparently also incurred approximately $1,000,000 in gambling debts
at Bellagio, another Nevada casino, but that entity opted not to respond to the objection to
its claim.  Accordingly, that claim was disallowed by prior order dated March 14, 2007.

[4] At one point in the briefs, the debtor questions whether this approval occurred in
conformity with Nevada law; this is a question which the Court finds unnecessary to
address for the reasons which follow.

In similar fashion, the claims of Caesar's Palace are related to a trip made

by the debtor where he signed markers totaling $250,000.[5]   Finally, Paradise's

claim of $368,411 appears to be the result of gaming credit extended to the debtor

during a trip to the Bahamas in October of 2005.  The markers all contain

enforcement terms which provide that they are to be governed by the laws of

states which permit the enforcement of gambling debts:  Nevada law in the context

of Wynn and Caesar's Palace, and New Jersey law in the case of Paradise.

Notwithstanding these provisions, the debtor and the trustee contend that this

Court should look to Wisconsin law and disallow the claims.

Historically, gaming debts were almost universally and categorically

regarded as unenforceable obligations in a court of law.  See Darren A. Prum,

Enforcement of Gaming Debt, 7 Gaming L. Rev. 17, 21 (2003) ("Traditionally,

many courts have refused to enforce casino credit on the basis of a public policy

against gambling"); Joseph Kelly, Caught in the Intersection Between Public Policy

and Practicality: A Survey of the Legal Treatment of Gambling-Related Obligations

in the United States, 5 Chap. L. Rev. 87, 122 (Spring 2002) ("All states in the

Union, influenced by the historical traditions against gambling, have started from

the premise that gambling debts are unenforceable.").  The legal principles

codified in England's Statute of Anne, which prohibited enforcement of these

---

[5] There is a dispute as to when this debt was incurred; Caesar's Palace contends the markers were executed in December of 2005, while the debtor claims that the last trips he made to Las  Vegas would have been in September or October, and that the casino may have filled in the date based on contractual language allowing the casino to complete any "missing amounts" or dates in the credit form.  Regardless, the debtor concedes that he signed the markers, which is the only relevant issue for the purpose of this claims dispute.

debts, were transplanted to America and those laws remain on the books in the

majority of states.  As a California court recently noted, the legal philosophy

reflected by these rules was that the law should not invite gamblers to play

themselves into debt, and that the judiciary should not thereafter "participate in

their financial ruin."  Metropolitan Creditors Service v. Sadri, 15 Cal. App. 4th 1821,

19 Cal. Rptr. 2d 646, 652 (1993).

Despite the expansion of legalized gaming and tribal casinos, many

jurisdictions - including Wisconsin - continue to recognize the strong public policy

perspectives reflected in these statutes.  For example, in State v. Gonnelly, 173

Wis. 2d 503, 496 N.W.2d 671 (Wis. Ct. App. 1992), the court rejected the

argument that the Wisconsin legislature had "impliedly repealed" its long-held ban

on the collection of gambling debts, even in the context of gaming that had been

legalized.  Other states have reached similar conclusions about the continuing

significance of their anti-gaming policies.  See Sadri, 19 Cal. Rptr. 2d at 650-51;

Kentucky Off-Track Betting v. McBurney, 993 S.W.2d 946, 949 (Ky. 1999);

Carnival Leisure Indus. v. Aubin, 53 F.3d 716 (5th Cir. 1995); Condado Aruba

Caribbean Hotel, N. V. v. Tickel, 39 Colo. App. 51, 561 P.2d 23 (1977).[6]

Indeed, even as recently as twenty-five years ago gaming debts could not

be enforced in Nevada courts.  See Sandler v. Eighth Judicial Dist. Court, 96 Nev.

---

[6] Some states have taken a different view, finding that the legalization of certain forms of gambling evidenced a shifting of social policy.  See Kramer v. Bally's Park Place, Inc., 311 Md. 387, 535 A.2d 466, 469 (1988) ("Maryland public policy concerning the enforceability of gambling debts and contracts largely depends on whether the type of gambling engaged in is legal or illegal.").

6

622, 614 P.2d 10 (1980); <u>Sea Air Support v. Herrmann</u>, 96 Nev. 574, 613 P.2d 413

(1980).[7]  The advent of easy credit and the exploding interest in gambling

transformed the landscape, as casinos now issue billions of dollars in credit

markers to tourists each year and want to collect on those claims after the visitors

return home.  The changes made to Nevada law were viewed as part of the

solution, not just to the enforcement of claims within the borders of the state but

also to the challenge of collecting debts from gamblers who lived in states still

reluctant to enforce such claims.  In this regard, the genesis of the casinos'

litigation strategy can be traced to a principle of constitutional law.  A century ago,

the U.S. Supreme Court required the state of Mississippi to honor a valid gambling

judgment obtained in Missouri notwithstanding the fact that the enforcement of

gambling debts was prohibited by Mississippi law.  <u>See</u> <u>Fauntleroy v. Lum</u>, 210

U.S. 230, 28 S. Ct. 641, 52 L. Ed. 1039 (1908).  Under the full faith and credit

clause of the Constitution, a state court judgment must be given the "same credit,

validity, and effect" in other jurisdictions as it would receive in the state rendering

the judgment, and "as the jurisdiction of the Missouri court [was] not open to

dispute the judgment cannot be impeached in Mississippi." <u>Id.</u>, 28 S. Ct. at 643.

Dusting off this ancient precedent, casinos now frequently obtain judgments

in "friendly" states and thereafter domesticate the judgments wherever the debtor

---

[7]  Intriguingly, Nevada legalized gambling in 1931, but did not legalize the
enforcement of gambling debts at the same time.  <u>See</u> Kelly, 5 Chap. L. Rev. at 96.  This
was changed by the enactment of 1983 Nev. Stat. § 335, now codified at Nev. Rev. Stat.
§ 463.368.  The Nevada legislature finally acted because the gaming collection rate,
generally 95%, had "dipped below 90% for the first time in history."  <u>Id.</u> at 97.

might reside.  Even states that generally refuse to honor gaming debts are forced

to acknowledge the validity of a final judgment from another court, even if the

underlying claim is repugnant to local policy.  See, e.g., Harrah's Club v. Mijalis,

557 So. 2d 1142 (La. App. 2d Cir. 1990) (Louisiana court must give the judgment

of another state the same conclusive effect between the parties that the judgment

would be given in the state where it was obtained, even if the underlying claim

would be unenforceable in Louisiana for public policy reasons); MGM Desert Inn,

Inc. v. Holz, 104 N.C. App. 717, 411 S.E.2d 399 (1991) (there is no exception to

the full faith and credit clause which would prohibit enforcement of a Nevada

judgment in North Carolina, notwithstanding the fact that gambling debts are

generally unenforceable in North Carolina courts); Coghill v. Boardwalk Regency

Corp., 240 Va. 230, 396 S.E.2d 838 (1990) (casino could not have obtained a

judgment on gambling debt in Virginia state court or even in a Virginia federal court

sitting in diversity, but Nevada judgment on the claim was entitled to full faith and

credit);  Conquistador Hotel Corp. v. Fortino, 99 Wis. 2d 16, 298 N.W.2d 236 (Wis.

Ct. App. 1980) (judgment on gambling debt from Puerto Rico court must be given

full faith and credit in Wisconsin courts).

    In the present case, none of the creditors hold valid judgments on their

claims.  The full faith and credit clause is thus inapplicable to the outcome.  See

Sadri, 19 Cal. Rptr. 2d at 648 (a forum state must give full faith and credit to a

sister state judgment but may refuse to entertain a lawsuit on a sister state *cause of

action* if its enforcement is contrary to the "strong public policy" of the forum state);

Mijalis, 557 So. 2d at 1145 (full faith and credit is required where judgments were

8

validly obtained and enforceable elsewhere; a different result may be reached

where the initial action is brought in a state where such gambling is illegal).

Instead, the creditors each hold an unliquidated claim for gambling debt and have

traveled to a Wisconsin bankruptcy court in an effort to enforce that debt.

The creditors contend that they were prevented from obtaining final

judgments on their claims only because of the debtor's "race" to file bankruptcy,

and that the debtor should not be rewarded for his conduct.  The debtor and the

trustee suggest that whatever protections are afforded by the bankruptcy filing, the

casinos themselves are also guilty of shopping for the most favorable forum.

Indeed, it seems that both parties seek to claim the law and the forum which is

most favorable to them:  one as a sword, and one as a shield.  Both sides have

played their best cards, as it were, and the issue is now which hand trumps the

other.  Can these debts be enforced in the absence of a valid judgment which

would compel respect by Wisconsin courts, or does Wisconsin law render the

claims unenforceable as against the debtor or the debtor's estate?

To answer the question, one must begin with an understanding of the claims

process, which is on occasion a deceptively simple procedure governed by the

bankruptcy code's provisions on filing claims and its definition of what constitutes a

claim.  Once a debtor files bankruptcy, 11 U.S.C. § 501(a) provides that creditors

are entitled to file claims.  11 U.S.C. § 101(5) defines a "claim" as, among other

things, a "right to payment, whether or not such right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured."  This definition is very broad,

9

and its purpose is to permit the bankruptcy court to consider and resolve virtually

all financial responsibilities of a debtor.  See Ohio v. Kovacs, 469 U.S. 274, 105

S. Ct. 705, 83 L. Ed. 2d 649, 656 (1985) (Congress desired a "broad definition" of

the concept of a claim in bankruptcy); Fogel v. Zell, 221 F.3d 955 (7th Cir. 2000)

("claim" is broadly defined in bankruptcy context to include equitable as well as

legal rights to payment); In re Shoen, 193 B.R. 302 (Bankr. D. Ariz. 1996)

(definition of "claim" is extremely broad and is designed to encompass virtually any

debt or other obligation of the debtor).

    Once a claim is filed, § 502(a) provides that it is "deemed allowed" unless a

party in interest objects.  If an objection is interposed to a particular claim, the court

must consider the objection and allow the claim unless there is a specific statutory

basis for denying the claim.  For purposes of the present dispute, the only basis for

disallowing the creditors' claims is that they are "unenforceable against the debtor

and property of the debtor, under any agreement or applicable law." See 11 U.S.C.

§ 502(b)(1).  The creditors contend that the Wisconsin anti-gaming statute is not an

"applicable law" which would render their claims unenforceable.  They submit that

the statute is inapplicable because (i) the Wisconsin statute does not apply to "out-

of-state" gambling; (ii) federal common law dictates the application of Nevada law;

(iii) the doctrine of conflict preemption subrogates Wisconsin law to the

"comprehensive" scheme created by Congress; and (iv) even if Wisconsin choice

of law standards govern this case, a Wisconsin court would find Nevada law

applicable to this transaction.  The debtor and the trustee take issue with each of

these contentions.

The Court will begin first with the notion that the doctrine of "conflict

preemption" compels the conclusion that Wisconsin law is inapplicable to this

transaction. Citing the case of <u>Mirage-Casino Hotel v. Simpson (In re Simpson)</u>,

319 B.R. 256 (Bankr. M.D. Fla. 2003), the creditors contend that the bankruptcy

code's broad definition of "claim"  requires application of the doctrine of conflict

preemption.  In <u>Simpson</u>, a casino brought a non-dischargeability complaint

against the debtor, and the debtor raised Florida's anti-gaming statute as a

defense.  The court noted that application of Florida law would indeed render the

plaintiff's claim unenforceable in state court, but found that the definition of a

"claim" in 11 U.S.C. § 101(5) is so broad that it "suggests" application of conflict

preemption.  The court ruled:

> The term "claim" is given the broadest possible meaning due to the
> Congressional intent to bring all legal obligations of a debtor within the
> bankruptcy case.  Application of conflict pre-emption subrogates
> Florida's statutory provision of non-enforcement of gambling debts to
> the comprehensive federal bankruptcy scheme crafted by Congress,
> through the authority of the United States Constitution.  Plaintiff's
> claims for gambling debts, normally unenforceable in Florida are
> deemed enforceable.

319 B.R. at 265.

It is true that under the doctrine of conflict preemption, state law must give

way to federal law in instances where "compliance with both state and federal law

would be impossible, or state law stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress."  <u>See</u> <u>Aerocon</u>

<u>Eng'g, Inc. v. Silicon Valley Bank (In re World Aux. Power Co.)</u>, 303 F.3d 1120,

1129 (9th Cir. 2002).  Likewise, it is an axiom of bankruptcy jurisprudence that the

11

code defines the concept of a "claim" in sweeping fashion, with the expectation that a bankruptcy court may appropriately resolve a host of legal matters relating to a debtor's financial condition.  See Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines), 125 F.3d 120 (3d Cir. 1997) (term "claim" is broadly construed to permit debtors to meet all of their legal obligations in bankruptcy); American Law Ctr. PC v. Stanley (In re Jastrem), 253 F.3d 438 (9th Cir. 2001) (breadth of code's definition of "claim" is critical in effectuating the policy of giving the debtor a "fresh start").

However, it is also important to recognize that the mere existence of a "claim" does not mean that all claims are necessarily accorded the same treatment in bankruptcy.  The code treats secured claims differently than unsecured claims, provides differing levels of priority to a variety of claims under § 507, and excepts only certain claims from the finality of the bankruptcy discharge.  The purpose of § 101(5) is not to preempt state law but rather to subject all "claims" to the bankruptcy process, in order to ensure that "all those with a potential call on the debtor's assets . . . come before the reorganization court so that those demands can be allowed or disallowed and their priority and dischargeability determined."  In re Caldor, Inc., 240 B.R. 180, 191 (Bankr. S.D.N.Y. 1999).  As the Ninth Circuit recognized in Jastrem, the broad definition of "claim" furthers the ultimate goal of the "fresh start" by subjecting a host of financial obligations to the terms of the debtor's discharge unless the code specifies otherwise.  253 F.3d at 442; see also 11 U.S.C. § 727(b); Kovacs, 83 L. Ed. 2d at 655 (a discharge in bankruptcy

discharges the debtor from all debts that arose before bankruptcy except those
which are statutorily excluded from coverage).[8]

In <u>Vanston Bondholders Protective Committee v. Green</u>, 329 U.S. 156, 67
S. Ct. 237, 91 L. Ed. 162, 166 (1946), the Supreme Court stated that in
determining which claims are allowable a bankruptcy court does not apply the law
of the state where it sits, but rather "must administer and enforce the Bankruptcy
Act as interpreted by this Court in accordance with authority granted by Congress
to determine how and what claims shall be allowed under equitable principles."
What must be remembered, however, is that this statement was made in a specific
context:  namely, in rejecting the notion that a bankruptcy court must <u>always</u> act as
if it were a federal court in a diversity case.[9]  More notably, the <u>Vanston</u> Court also
stated that:

> A purpose of bankruptcy is so to administer an estate as to bring
> about a ratable distribution of assets among the bankrupt's creditors.
> What claims of creditors are valid and subsisting obligations against
> the bankrupt at the time a petition in bankruptcy is filed is a question
> which, in the absence of overruling federal law, is to be determined by
> reference to state law.

91 L. Ed. at 165.

Bankruptcy courts routinely reference state law to determine whether claims
are valid, and parties objecting to a claim are generally given the benefit of any

---

[8] The term "debt" is defined simply as "liability on a claim." <u>See</u> 11 U.S.C.
§ 101(12).

[9] Specifically, the court stated that <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 58 S. Ct.
817, 82 L. Ed. 1188 (1938), had "no such implication" in the context of claims allowance in
bankruptcy cases.  <u>Vanston</u>, 91 L. Ed. at 166.

defense which would have been available to a debtor under state law, including

fraud, lack of consideration, statutes of limitations, or the statute of frauds.  In re

Gridley, 149 B.R. 128 (Bankr. D.S.D. 1992); see also Bailey v. Big Sky Motors, Ltd.

(In re Ogden), 314 F.3d 1190 (10th Cir. 2002) (while federal law determines when a

claim arises for bankruptcy purposes, non-bankruptcy substantive law usually

determines the existence of the claim); Diamant v. Kasparian (In re Southern Cal.

Plastics, Inc.), 165 F.3d 1243 (9th Cir. 1999) (state law controls the validity and

effect of liens in the bankruptcy context).  The Supreme Court has reiterated this

conclusion on several occasions.  See Raleigh v. Illinois Dep't of Revenue, 530

U.S. 15, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000) (the "basic rule" in bankruptcy is

that state law governs substance of claims); Grogan v. Garner, 498 U.S. 279, 283,

111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (the validity of a creditor's claim is

determined by rules of state law).[10]

Here, then, is the reason why "conflict preemption" is inapplicable to the

dispute before the Court now.  To say that the broad definition of a "claim"

automatically overrules a state law which impacts the enforceability or validity of

that obligation is to suggest that any "claim" must automatically be an allowed one

under § 502.  Put another way, the creditors' argument on this issue may be

summed up like this:  Our claims are allowed claims simply because they are

claims. Notably, neither the Simpson court nor the creditors in this case have

---

[10]  This "basic federal rule" was most recently reaffirmed during the Court's last
term.  In Travelers Cas. & Sur. Co. of Am. v. PG&E, ___ U.S. ___, 127 S. Ct. 1199, 167
L. Ed. 2d 178, 186  (2007), the Court again observed that Congress has "generally left the
determination of property rights in the assets of a bankrupt's estate to state law."

offered any mechanism for distinguishing between which state law defenses are preempted and which are not, and "conflict preemption" based solely upon the definition of a "claim" would seemingly affect more than just state anti-gaming laws. Taken to its logical conclusion, it would turn the law on its head and prevent state law defenses from <u>ever</u> precluding enforcement of an obligation. But that is not the way the code works; generally, non-bankruptcy law is applied to determine the validity and extent of a claim in bankruptcy, and a debtor objecting to the allowance of a claim may avail himself of those defenses available under local (or "applicable") law. <u>Mandalay Resort Group v. Miller (In re Miller)</u>, 292 B.R. 409 (B.A.P. 9th Cir. 2003); <u>In re Toledo</u>, 17 B.R. 914 (D.P.R. 1982). In <u>Miller</u> the court considered - and rejected - the precise argument that California law on the enforceability of gambling debts was preempted by the bankruptcy code pursuant to the Supremacy Clause. The court stated:

> The Supremacy Clause invalidates state laws that are contrary to or interfere with federal law. U.S. Const. art. VI, cl. 2; <u>In re Cybernetic Servs., Inc.</u>, 252 F.3d 1039, 1045 (9th Cir. 2001). Congressional intent to preempt state law must be clear and express. <u>Cybernetic</u>, 252 F.3d at 1046. While the dischargeability of debts in bankruptcy is governed by federal law, the existence and validity of a debt is determined by reference to state law. Congress did not intend to preempt state law on this point. To the contrary, it provided in § 502(b)(1) that a claim cannot be allowed if it is unenforceable under state law.

292 B.R. at 413.[11]

---

[11]  The <u>Miller</u> court subsequently concluded that under federal common law choice of laws principles, Nevada law, rather than California law, was the "applicable" law for purposes of § 502(b)(1). In the Ninth Circuit, federal common law choice of law principles apply in bankruptcy cases. <u>See</u> <u>Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re</u>
(continued...)

The ultimate proof of this is to presuppose for a moment that this gambling

debt had been incurred in Wisconsin, or that the Nevada and New Jersey

legislatures did not authorize the enforcement of gaming debts.  Under either

instance, the creditors' claims would clearly be disallowed, as there would be no

legal basis for suggesting that they would be enforceable against the debtor.  To

say otherwise would mean that claims which were unenforceable under state law

suddenly transformed into enforceable claims simply because the debtor filed

bankruptcy.  As Vanston teaches, whether there is a "valid and subsisting

obligation," or claim, at the time of bankruptcy is generally determined by reference

to state law.  While it is true that an "overruling federal law" may alter this equation,

such a federal law must be found outside the simple definition of what constitutes a

"claim."[12]

---

[11](...continued)
Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1069 (9th Cir. 2002).  This remains something of
an open issue in the Seventh Circuit, as will be discussed shortly.

[12]  In Vanston, there was a federal policy regarding the payment of interest on
claims which the Court found to override the concerns of the various state jurisdictions that
otherwise might have provided the applicable law. It is fair to say that there is no overriding
federal policy supporting the enforceability of gaming debts in bankruptcy proceedings, as
federal polices regarding gaming are ambivalent at best.  See generally, G. Robert Blakey
and Harold A. Kurland, The Development of the Federal Law of Gambling, 63 Cornell L.
Rev. 923 (1978); Jonathon Gottfied, The Federal Framework for Internet Gambling, 10
Richmond J.L. & Tech. 26 (2004).  In 1999, the Final Report of the United States Gambling
Commission unanimously recommended a moratorium on the spread of gambling
anywhere in the United States.  See Nat'l Gambling Impact Study Comm'n, Final Report at
1-7 (1999) ("The Commissioners believe it is time to consider a pause in the expansion of
gambling").  Most recently, Congress passed the "Unfair Internet Gambling Enforcement
Act of 2006," which prohibits the use of credit cards to place wagers on Internet gambling
sites.  In the context of this case, the bankruptcy code simply authorizes the assertion of
such claims (as a "right to payment") and is silent as to the validity or enforcement of such
claims.  The result, as indicated in the text of this decision, is that the Court is obligated to
consult appropriate state law to determine whether the claims are valid or enforceable
(continued...)

16

As the <u>Miller</u> court noted, the "real question" in this case is which state's law

is the "applicable" law for purposes of § 502(b)(1).  292 B.R. at 413.  This

determination requires a resort to choice of laws principles, which contemplate

balancing the competing interests of the various jurisdictions which may be

connected to a particular transaction.  The <u>Vanston</u> Court noted the challenges

inherent in this determination when it observed:

> But obligations, such as the one here for interest, often have
> significant contacts in many states, so that the question of which
> particular state's law should measure the obligation seldom lends
> itself to [a] simple solution.  In determining which contact is the most
> significant in a particular transaction, courts can seldom find a
> complete solution in the mechanical formulae of the conflicts of law.
> Determination requires the exercise of an informed judgment in the
> balancing of all the interests of the states with the most significant
> contacts in order best to accommodate the equities among the parties
> to the policies of those states.

91 L. Ed. at 165.  In this regard, <u>Vanston</u> itself does not direct a specific result or

identify the principles which might control this balancing act; indeed, the Court

found it unnecessary to determine which state's law might otherwise apply in that

case, as it ruled that an overriding federal policy controlled the outcome.  <u>Id.</u> at 166

("When and under what circumstances federal courts will allow interest on claims

against debtors' estates being administered by them has long been decided by

federal law.").  As already noted, there is no such federal policy here, and so the

---

[12](...continued)
under § 502(b)(1).

17

Court must select the appropriate law from the jurisdictions which have "contacts"

with the transaction - namely, Wisconsin, Nevada, and New Jersey.[13]

A number of courts have concluded that bankruptcy courts should use

"federal" choice of law rules when determining which state's laws should apply to a

particular controversy.  See Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re

Vortex Fishing Sys, Inc.), 277 F.3d 1057 (9th Cir. 2002); Olympic Coast Inv., Inc. v.

Wright (In re Wright), 256 B.R. 626 (Bankr. D. Mont. 2000);  Limor v. Weinstein &

Sutton (In re SMEC, Inc.), 160 B.R. 86 (M.D. Tenn. 1993). The general logic of this

approach is as follows:  In Erie R.R. v. Tompkins, the Supreme Court ruled that a

federal court, sitting in diversity, should act as though it were simply another state

court.  In Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020, 85

L. Ed. 1477 (1941), the Court then extended this holding to conflict of laws

determinations, saying that a federal court should follow the choice of laws rules of

---

[13]  In In re Smith, 66 B.R. 58, 61 (Bankr. D. Md. 1986), the court concluded that the phrase "applicable law" in § 502(b)(1) "deals with the law of the place of the making of the contract, not of the forum, unless the parties indicate otherwise."  While the Smith court made reference to the legislative history of § 502, nothing in that history, or in the statute itself, specifically delineates how a court is to determine what constitutes "applicable law."  The cases referenced in support of Smith's conclusion both involve choice of law determinations, not construction of § 502 itself.  See Keco Industries, Inc. v. ACF Industries, Inc., 316 F.2d 513, 514 (4th Cir. 1963); In re Parkwood, Inc., 461 F.2d 158, 171 (D.C. Cir. 1971).  Consequently, the holding in Smith is properly regarded as a shorthand reference to the "lex loci contractus" principle in the context of choice of law determinations:  i.e., the general rule that the law of the jurisdiction where a contract is made is normally the law which controls its validity and construction.  See Kramer, 535 A.2d at 467.  This principle is not an absolute rule, and will not be applied in all instances.  Id. ("Thus, under certain circumstances, Maryland courts will not enforce an out-of-state contract provision which is against Maryland public policy."); see also Restatement (Second) of Conflict of Laws § 188(3) (1971) ("If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied" (emphasis added)).  The Smith court did not discuss whether a bankruptcy court should apply this general rule in the context of the forum state's choice of law principles or under notions of federal common law; it is to that issue which the Court must now turn.

the state in which it sits.  In <u>Vanston</u>, however, the Court stated that the <u>Erie</u>

doctrine is not controlling when a bankruptcy court determines what claims are

allowable or how assets should be distributed.   Consequently, courts like those in

<u>Vortex Fishing</u> and <u>SMEC</u> find it appropriate for the bankruptcy court to "employ its

power to apply and create federal common law by exercising *independent judgment*

as to choice of law." <u>See</u> <u>In re Segre's Iron Works, Inc.</u>, 258 B.R. 547, 551 (Bankr.

D. Conn. 2001).

Wynn and Desert Palace urge the Court to adopt the notion that this Court is

bound by federal common law to find that Nevada is the appropriate source of

"applicable law" for purposes of this § 502(b)(1) determination.  The courts which

have adopted federal common law choice of law rules in bankruptcy cases follow

the "significant relationship" test of the Restatement (Second) of Conflict of Laws.

<u>Miller</u>, 292 B.R. at 413-14.  Under that test, if the place of negotiating the contract

and the place of performance are in the same state, the local law of that state will

be applied.  <u>See</u> Restatement (Second) of Conflict of Laws § 188(3) (1971). Wynn

and Desert Palace submit that under this test, as the debtor acknowledged

executing the application and markers in Nevada, and the "place of performance"

was the Nevada casinos, Nevada law would apply.  <u>Id.</u> at 414; <u>see also</u> <u>Desert

Palace, Inc. v. Hionas (In re Hionas)</u>, 361 B.R. 269 (Bankr. S.D. Fla. 2006).[14]

---

[14] During the briefing of this matter, counsel for Paradise Enterprises indicated that
it "joined" in the arguments advanced by Wynn and Desert Palace. Under either federal
common law or Wisconsin choice of laws principles, however, it is impossible to conclude
that New Jersey law should be applied to the Paradise markers.  Those markers were
executed in the Bahamas, and related to gambling debts incurred at Atlantis Casino, which
is located on Paradise Island in the Bahamas. The only "contact" with New Jersey appears
(continued...)

As at least one court has noted, however, the "federal common law"
approach to choice of laws questions in the bankruptcy context appears to be the
"minority view."  In re Gibson, 234 B.R. 776, 779 (Bankr. N.D. Cal. 1999).   Other
courts follow a different rule.  See Amtech Lighting Servs. v. Payless Cashways,
Inc. (In re Payless Cashways), 203 F.3d 1081, 1084 (8th Cir. 2000) ("The
bankruptcy court applies the choice of law rules of the state in which it sits."); see
also Gulfcoast Workstation Corp. & Relational Fund Corp. v. Peltz (In re Bridge
Info. Sys.), 314 B.R. 421 (Bankr. E.D. Mo. 2004); First Interregional Equity Corp. v.
First Capital Servs. (In re First Interregional Advisors Corp.), 271 B.R. 463 (Bankr.
D.N.J. 2001).  These courts recognize the limitations of Vanston but hold that the
Supreme Court's statements in that case simply indicate that "application of a
federal rule is not foreclosed by Erie where there is a significant federal interest."
See Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 607 (2d Cir. 2001).
More crucially, courts like the one in Gaston & Snow conclude that Vanston does
not mandate the use of federal conflicts rules in every case, because to do so
would be to create a conflict with the Supreme Court's other pronouncements on
the creation of federal common law.  Id.  As the Fourth Circuit stated in In re Merritt
Dredging Co., 839 F.2d 203, 206 (4th Cir. 1988):

---

[14](...continued)
to be that its laws are favorable to the creditor.  Under federal common law, the choice of
law provision in the markers would be disregarded as the chosen state has "no substantial
relationship" to the parties or the transaction, and application of the law of the chosen state
would be contrary to a "fundamental policy of a state which has a materially greater
interest than the chosen state."  Wright, 256 B.R. at 632.  Consequently, the only
remaining question as to the Paradise markers is whether the Wisconsin anti-gaming
statute is applicable to out-of-state gambling debts.

> We believe . . . that in the absence of a compelling federal interest
> which dictates otherwise, the <u>Klaxon</u> rule should prevail where a
> federal bankruptcy court seeks to determine the extent of a debtor's
> property interest . . . . A uniform rule under which federal bankruptcy
> courts apply their forum states' choice of law principles will enhance
> predictability in an area where predictability is critical. Most important,
> such a rule would accord with the model established by <u>Erie</u> and
> <u>Klaxon</u>. Both those cases make clear that federal law may not be
> applied to questions which arise in federal court but whose
> determination is not a matter of federal law. . . . Such is the case with
> questions regarding the extent of a bankruptcy debtor's property
> interests . . . . It would be anomalous to have the same property
> interest governed by the laws of one state in federal diversity
> proceedings and by the laws of another state where a federal court is
> sitting in bankruptcy.

The Seventh Circuit has not definitively resolved this issue. In fact, in <u>In re</u>

<u>Morris</u>, 30 F.3d 1578, 1581-82 (7th Cir. 1994), the court noted the dispute but

specifically left the issue open, finding that under either approach the same

substantive law would be applied to the controversy in question. An earlier case,

however, appears to suggest a measure of agreement with <u>Gaston & Snow</u> and

<u>Merritt Dredging</u>, as the court observed that "[w]hen (as here) the parties do not

say that the forum state's conflict-of-laws rules require the application of another

state's substantive law, this means we must apply the forum state's substantive

law." <u>See</u> <u>In re Iowa R. Co.</u>, 840 F.2d 535, 543 (7th Cir. 1988). More recently, in

<u>Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.</u>, 313 F.3d 385, 390

(7th Cir. 2002), the court stated that "[i]t is true that this is not a diversity case, but

the <u>Erie</u> doctrine applies to any case in which state law supplies the rule of

decision." This statement is remarkably similar to the Second Circuit's statement

that "the <u>Erie</u> doctrine applies, whatever the ground for federal jurisdiction, to any

issue or claim which has its source in state law." <u>See</u> <u>Gaston & Snow</u>, 243 F.3d

21

599 (citing <u>Maternally Yours, Inc. v. Your Maternity Shop, Inc.</u>, 234 F.2d 538, 541

n. 1 (2d Cir. 1956)).

Given the similarity between the Seventh Circuit precedent and those

circuits which have opted for a tailored view of <u>Vanston</u>'s impact on bankruptcy

jurisprudence, it appears appropriate to follow those cases.  While <u>Vanston</u> notes

that a bankruptcy court's claims process is not definitively controlled by the <u>Erie</u>

doctrine, the Supreme Court did not mandate the wholesale creation of federal

conflict rules.  Instead, <u>Vanston</u> appears to illuminate a simple principle:  namely,

that in instances where a significant federal policy dictates a result, the bankruptcy

court is not bound to adopt a contradictory state law.  However, to the extent no

such federal policy exists, determining which claims are "valid and subsisting

obligations against the bankrupt at the time a petition in bankruptcy is filed" is

handled by reference to state law.  <u>Vanston</u>, 91 L. Ed. at 165.  In those cases in

which state law provides the rule of decision, the <u>Erie</u> doctrine - and by extension,

the <u>Klaxon</u> rule regarding the application of state conflict of laws provisions -

should apply.  <u>Merritt Dredging</u>, 839 F.2d at 206; <u>see also</u> <u>Zapata Hermanos</u>, 313

F.3d at 390; <u>Berger v. AXA Network LLC</u>, 459 F.3d 804, 809-10 (7th Cir. 2006)

("our task, when the underlying claim is a <u>federal</u> claim, is to fashion a <u>federal</u>

choice of law rule").[15]

---

[15]  In <u>Hionas</u>, the court suggested that as the claims process is at the "core of the
court's bankruptcy jurisdiction," a "federal analysis" is appropriate.  361 B.R. at 276.  There
is certainly some justification for such a federal approach.  <u>See</u> Paul R. Glassman, <u>Choice
of State Law in Bankruptcy Cases</u>, Part II 24-Oct. Am. Bankr. Inst. J. 20 (2005), in which
the author suggests that the weakness of the <u>Klaxon</u> rule is its "propensity for anomalous
results."  However, uniformity alone does not seem a sufficient ground for the creation of
(continued...)

Wisconsin courts do not appear to simply follow the Restatement (Second) approach when dealing with conflict of law questions.  See generally, Shirley A. Wiegand, Officious Intermeddling, Interloping Chauvinism, Restatement (Second), and Leflar: Wisconsin's Choice of Law Melting Pot, 81 Marq. L. Rev. 761 (Spring 1998).  The "first rule" in the choice of law analysis is that the law of the forum should presumptively apply unless it becomes clear that non-forum contacts are of greater significance.  Drinkwater v. Am. Family Mut. Ins. Co., 2006 WI 56, 290 Wis. 2d 642, 714 N.W.2d 568, 575-76 (2006); see also Cowley v. Abbott Labs., 476 F. Supp. 2d 1053, 1057 (W.D. Wis. 2007). When faced with a choice of law question, Wisconsin courts apply the five "choice-influencing factors" articulated in Heath v. Zellmer, 35 Wis. 2d 578, 151 N.W.2d 664 (Wis. 1967).  Cowley, 476 F. Supp. 2d at 1057.  These factors include (i) the predictability of results, (ii) the maintenance of interstate and international order, (iii) the simplification of the judicial task, (iv) advancement of the forum's governmental interest, and (v) application of the better rule of law.  Id.; see also Drinkwater, 714 N.W.2d at 576; State Farm Mut. Auto.

---

[15](...continued)
federal common law in this instance.  See Gaston & Snow, 243 F.3d at 606 ("Klaxon rejected the need for uniformity as a justification for displacing state conflicts rules"). Further, the claims process is one of the areas in which bankruptcy jurisdiction is most likely to intersect with state law, and the Supreme Court has repeatedly stressed how the "basic rule" is that state law is to provide the rule of decision.  Indeed, in Raleigh the Supreme Court itself seemed to approve a limited reading of Vanston when it rejected the notion that the allowance of claims is automatically a federal matter, observing that "Vanston, in fact, concerned distribution of assets, not the validity of claims in the first instance." 530 U.S. at 23-24.  If, as the Seventh Circuit has stated, the Erie doctrine is applicable in any case in which state law supplies the rule of decision, Zapata Hermanos, 313 F.3d at 390, it follows that it (and Klaxon) must be applicable in the claims process as well, at least whenever a claim is predicated upon state law rather than federal law, or where no overriding federal policy dictates a different result.  Gaston & Snow, 243 F.3d at 607.

Ins. Co. v. Gillette, 2002 WI 31, 251 Wis. 2d 561, 641 N.W.2d 662 (2002); Air

Products & Chemicals, Inc. v. Fairbanks Morse, Inc., 58 Wis. 2d 193, 206 N.W.2d

414 (Wis. 1973); Employers Ins. v. Certain Underwriters at Lloyd's London, 202

Wis. 2d 673, 552 N.W.2d 420 (Wis. Ct. App. 1996).  Notably, in Heath the court

observed that the conflict question is not simply resolved by determining which

jurisdiction had the most number of "contacts":

> Nor does it mean that foreign law will be applied even though the
> contacts with a foreign jurisdiction are quantitatively overwhelming,
> for, if the foreign jurisdiction's contacts are less relevant qualitatively
> or if the foreign law is truly repugnant to Wisconsin policy, the
> effectuation of Wisconsin policy may be the most decisive element
> (e.g., it is difficult to imagine a Wisconsin court enforcing a contract of
> prostitution no matter how overwhelming the contacts of the parties
> and the contract might be with a hypothetical jurisdiction that
> permitted such an agreement).

35 Wis. 2d at 593.

The debtor and the trustee acknowledge that the "markers" were executed in

either Nevada or the Bahamas, in connection with gambling activities in those

locations.  All of the markers contain a choice of law provision.  Under Wisconsin

law, the parties to a contract may expressly agree that the law of a particular

jurisdiction will control their relationship, but they cannot do so "at the expense of

important public policies of a state whose law would be applicable if the parties

choice of law provision were disregarded."  Bush v. National School Studios, Inc.,

139 Wis. 2d 635, 642, 407 N.W.2d 883 (Wis. 1987); Beilfuss v. Huffy Corp., 2004

WI App 118, 274 Wis. 2d 500, 685 N.W.2d 373 (2004); Appleton Papers, Inc. v.

Home Indem. Co., 2000 WI App 104, 235 Wis. 2d 39, 612 N.W.2d 760 (2000).

Consequently, the Court must go beyond the contractual provision to consider

whether Wisconsin substantive law would be applicable to this transaction.  As
noted previously, while the Paradise markers specifically reference the application
of New Jersey law, the creditor has not identified any "contacts" between New
Jersey and the transaction in question.  New Jersey is not the place of contracting
nor the place of performance, nor does it appear to be the place of repayment.
Wisconsin, the domicile of the debtor, clearly has a greater relationship with this
transaction than New Jersey, and in the absence of the contractual provision
Wisconsin law would undoubtedly trump the law of a state so wholly unconnected
to the transaction.  See Beloit Liquidating Trust v. Grade, 2004 WI 39, 270 Wis. 2d
356, 374, 677 N.W.2d 298 (2004) (articulating a test of whether "the contacts of
one state to the facts of the case are so obviously limited and minimal that
application of that state's law constitutes officious intermeddling").

Wynn and Desert Palace submit that at least as to their claims, Nevada, not
Wisconsin, has the greater number of "contacts" with the transaction.  It is true that
the markers were signed in Nevada, and were related to the debtor's gambling
activities in Las Vegas.  Given the transitory nature of most casino customers,
however, it is unclear whether performance of the debtor's portion of the credit
transaction (i.e., repayment of the debt) was intended to be made "in" Nevada, and
the markers themselves do not reference a place of repayment.[16]  Certainly the
litigation strategy employed by the casinos recognizes that they may need to seek
collection of their claims in other jurisdictions, including those which refuse to

---

[16] The place of repayment can be an important factor.  See Restatement (Second)
of Conflict of Laws § 195.

25

enforce gambling debts.  Further, while Wynn takes exception to some of the

debtor's characterizations of their relationship, it does not deny the debtor's

allegations of frequent solicitations and telephone calls to his home in Wisconsin,

or the offers of free travel and accommodations.  Notwithstanding the statement in

Wynn's credit agreement that it "endorses responsible gaming," it certainly appears

that the casino did what it could to lure the debtor back to the tables, and reached

into Wisconsin in order to do so.

Consequently, it is not "clear" whether Nevada's contacts are of greater

significance, although Nevada's relationship is not "so obviously limited and

minimal" as to characterize application of Nevada law as "officious intermeddling."

Drinkwater, 714 N.W.2d at 576.  Under Wisconsin law, the type and quantity of

"contacts" is not conclusive or controlling, especially where both states have

significant connections to the dispute, and the Court must therefore consider the

"choice-influencing factors."  Id. at 577.  The first factor - predictability of results -

deals with the parties' expectations.  As the court stated in Drinkwater, the

question is "what legal consequences comport with the predictions or expectations

of the parties."  Id.  In this regard, application of Wisconsin law (or the law of the

forum) would lead to predictable results.  In virtually every state, the enforcement

of a pre-judgment gambling debt incurred in another forum would be governed by

the forum's anti-gaming provisions.  In certain instances, states have concluded

that their anti-gaming laws do not apply to gambling debts executed or incurred in

a forum which permits or legally recognizes such transactions.  Nonetheless, such

a result is based upon an interpretation of the forum's own law, rather than the law

26

of another jurisdiction.  The reasonable expectation of both parties to a gambling

transaction is that it is unenforceable in the majority of jurisdictions, or at the very

least that such transactions are subject to the anti-gaming laws of the forum,

whatever those may be, up until the moment the creditor obtains a valid judgment

under the laws of a state which permits enforcement.[17]

The second factor involves the maintenance of interstate order.  Under this

factor, a jurisdiction which is "minimally concerned" with the issue defers to a

jurisdiction which is "substantially concerned."  Admittedly, Nevada has an interest

in these transactions, most notably in the revenues generated by not only the

casinos but all of the attendant businesses as well, be it the hotels, the restaurants,

or even the legalized prostitution.  Wisconsin, of course, has an interest in the

financial stability of its citizens, as well as the avoidance of the social costs which

arise from the wholesale enforcement of gambling debts. There is little reason to

think that application of Wisconsin law will lead to forum shopping.  Casinos have

long understood the extraterritorial implications of state anti-gaming laws, and it is

for this precise reason that they typically seek to liquidate their claims in Nevada

---

[17] The Court is not sympathetic to the suggestion that the debtor "raced" to file bankruptcy, especially since the creditors are themselves engaged in their own practice of forum shopping by seeking a judgment in a "friendly" jurisdiction which would thereafter be entitled to full faith and credit elsewhere.  The simple fact of the matter is that the creditors here have traveled to Wisconsin, a jurisdiction which generally does not permit the enforcement of gambling debts, in order to try and collect on gambling claims which they were unable to reduce to judgment prior to the debtor's bankruptcy.  Many creditors find the validity or enforceability of their claims adversely impacted by the timing of a debtor's bankruptcy petition, and the creditors' failure to reduce their claims to judgment - the only method of conclusively establishing the existence and validity of their claims outside the state of Nevada - is not a far cry from the plight of other creditors whose claims are judged by their status as of the petition date.

before pursuing collection elsewhere.  In any event, it is impossible to conclude

that Wisconsin is only "minimally concerned" with the matter, as it has a long-

standing public policy against witnessing its citizens plunge headlong into debt by

gambling on credit.

     The third factor considers how the choice of laws might impact the

simplification of the judicial task.  Enforcement of Wisconsin law as a threshold

matter will undoubtedly simplify the judicial task, as otherwise the Court would be

required to investigate questions of Nevada law as well.  As the <u>Drinkwater</u> court

observed, "[T]he judicial task is rarely simplified when lawyers and judges must

apply themselves to foreign law."  714 N.W.2d at 578.  The fourth factor is the

advancement of the forum's governmental interests.  The application of this factor

becomes "a major, though not in itself a determining, factor in the ultimate choice

of law." <u>Gillette</u>, 641 N.W.2d at 678.  Clearly, application of Wisconsin law will

undoubtedly advance the forum's governmental interests.  Wisconsin, like many

states, has opted to consider the overwhelming majority of gambling transactions

void so as to preclude judicial participation in the financial ruination of gamblers

and their families.

     The fifth, and final, factor considers whether application of Wisconsin law is

likely to do justice to the parties as the "better rule of law."  When contrasting the

fact that the creditors are "out" only their profits on a gambling transaction with the

very real social costs which would result from the wholesale enforcement of such

claims, the Court can only find that the better, more equitable result is to apply

Wisconsin law rather than Nevada law.  When considering these factors as a

whole, the Court concludes that Wisconsin law must be applied to this transaction.

And so, at long last, the Court turns to the statute itself.  The creditors cite

the case of <u>Schoenberg v. Adler</u>, 105 Wis. 645, 81 N.W. 1055 (Wis. 1900), for the

proposition that the Wisconsin anti-gaming statute has no "extra-territorial

application."  In that case, the plaintiff had agreed to cover the gambling losses of

the defendant at a gambling club in Denver, Colorado.  When the plaintiff sued to

recover from the defendant, the Wisconsin Supreme Court appears to have

indicated that the gambling occurred in Colorado and that the case did not come

under "the statute of this state."  Less than a year later, however, the court in

<u>Bartlett v. Collins</u>, 109 Wis. 477, 482, 85 N.W. 703, 705 (Wis. 1901), ruled that

another gambling contract was subject to the terms of the Wisconsin anti-gaming

statute.  As in the present case, there were conflicts of law questions raised by the

fact that the contract had been made in one state (Wisconsin), while performance

was intended to be made in another (Illinois).  Nonetheless, the court stated:

> [E]ven were it held to be an Illinois contract, it is not seen how the
> result would be different.  It is a universal principle that the courts of
> no state will hold valid any contract which is injurious to the public
> rights of its people, offends their morals, contravenes their policy, or
> violates a public law. . . (citations omitted).  So, in either event, if the
> alleged sale of the grain was in fact no sale, but only a gambling
> transaction, and so intended by both parties, then the contract before
> us can be the foundation of no rights in our courts.

<u>Id.</u> at 705.  Likewise, in <u>Conquistador Hotel Corp. v. Fortino</u>, 99 Wis. 2d 16, 298

N.W.2d 236 (Wis. Ct. App. 1980), the plaintiff sought to enforce a gambling debt

which had been reduced to judgment in Puerto Rico.  The defendant argued that

because the underlying claim could not have been asserted in Wisconsin courts,

the judgment should not be enforced.  The Wisconsin Court of Appeals assumed

that the original claim was contrary to the "strong public policy of Wisconsin," but

nonetheless found that the judgment was to be accorded full faith and credit.  As

the debtor and the trustee note, there would have been no need for such an

"assumption" if the Wisconsin anti-gaming statute had no extra-territorial effect.

Most notable, however, is the language of the statute itself; with only limited

exceptions, it provides that "all" promises, agreements, or contracts which reflect a

gambling debt are void.  The broad application of the statute is reflected in State v.

Gonnelly, 173 Wis. 2d 503, 496 N.W.2d 671 (Wis. Ct. App. 1992), in which the

court concluded that a check written for the purposes of gambling was void.  The

court rejected the argument that the legalization of certain gaming activities

constituted the implied repeal of the legislative ban on the collection of gambling

debts, and stated:

> Indeed, a strong public policy exists which favors the continuing
> validity of a statute except where the legislature has acted explicitly to
> repeal it (citation omitted). The rule against implied repeal especially
> applies where the earlier statute is of long standing and has been
> stringently followed, unless it is so manifestly inconsistent and
> repugnant to the later statute that the two cannot reasonably stand
> together.

496 N.W.2d at 674.

After the ruling in Gonnelly, the Wisconsin legislature modified Wis. Stat.

§ 895.055 to provide that the statute does not apply to obligations associated with

activities permitted under certain chapters of state law or under state or federal

laws relating to the conduct of gaming on Indian lands.  See Wis. Stat.

30

§ 895.055(3).[18]  Clearly, the Wisconsin legislature believes that the prohibition on
gaming debt remains an important public policy, as it narrowly tailored its exception
to a few specific categories of gambling.

Far from repealing the statute, or providing that all legal gambling activities
were excepted from the statute, the legislature crafted a precise expression of its
intent - namely, a policy determination that a few types of gambling debts could be
enforced while the rest remained subject to the long-standing prohibition against
collection.  While this represents something of a change in the state's public policy,
it can only reinforce the notion that Wisconsin continues to condemn gambling on
credit and prohibits the enforcement of *any* obligation relating to the forms of
gambling not specifically excluded from the scope of the statute.  The Wisconsin
Supreme Court has repeatedly stressed that the courts of this state will not enforce
an agreement which violates a strong public policy, and in accordance with Bartlett
v. Collins and Gonnelly, this Court must conclude that a Wisconsin court would find
that no matter what other state's law might be applicable to this transaction, if it
represents a gambling transaction and was so intended by the parties, it "can be
the foundation of no rights in [Wisconsin] courts."  Bartlett, 85 N.W. at 705.

The markers clearly represent gambling debts, and were intended as such
by both parties.  Accordingly, the objections to the creditors' claims must be
sustained.  In keeping with the city's tourism slogan, these liabilities happened in
Vegas, and they must stay in Vegas.  Pursuant to 11 U.S.C. § 502(b)(1), the

---

[18] The permitted activities include pari-mutual wagering, bingo, raffles, "crane
games," the state lottery, and tribal gaming.

creditors' claims are disallowed, as under the applicable law of Wisconsin they
cannot be enforced against the debtor or property of the debtor.

This decision shall constitute findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil
Procedure.

Dated:  October 16, 2007

BY THE COURT:

/s/ Thomas S. Utschig

_____

Hon. Thomas S. Utschig
U.S. Bankruptcy Judge